STATE OF SOUTH CAROLINA v. PORT ROYAL & A. RY. CO.    KING et al. v. SAME.    OGDEN v. SAME.    Ex parte LOUISVILLE & N. R. CO.

(Circuit Court, D. South Carolina.    October 7, 1898.)

**1.** RAILROADS—JOINT MANAGEMENT BY LESSEES—RIGHTS OF PARTIES.
The purchasers at forced sale of the interest of one of two lessees of a railroad system which was managed by a joint commission created by the lessees afterwards became indebted to the managing agency.    *Held*, that they could not withhold payment of one-half of such indebtedness, on the ground that they were entitled to half the earnings of the system, without showing that at the time the indebtedness was due there were net earnings to be divided, against their share of which the indebtedness could be set off.

**2.** SAME—PURCHASER OF PART INTEREST.
In such case the purchasers could not repudiate expenditures by the commission made necessary by contracts entered into before their purchase with the approval of their predecessor in interest.

**3.** SAME—UNAUTHORIZED IMPROVEMENTS.
The agreement between the original owners of the lease by which the managing commission was created provided for the election of the commissioners annually, but after the sale of the interest of one of such lessees a dispute arose as to its ownership, during which no election for

commissioners was held, the old members continuing to act. *Held,* that expenditures made by the commissioners while so acting, for permanent improvements, were unauthorized, and not binding as against the purchasers whose title to the interest in dispute was afterwards established.

4. SAME—RECEIVERSHIP—CONTRACTS BY RECEIVER.

A receiver operating a railroad is not required to come to the court for special authority to enter into contracts for supplies or accommodations necessary to the operation of the road; such matters being necessarily left to his discretion, which will only be reviewed on a showing of bad faith, or that the contracts are so extravagant as to be unconscionable.

5. SAME—ACCOUNTS AGAINST RECEIVER—INTEREST.

In South Carolina, where interest is allowed on open accounts only by positive stipulation, or by agreement established by a course of dealing, it is not recoverable on a running account in favor of one railroad against the receiver of another, which had never been stated, and on which payments were made from time to time.

Joseph B. Cumming, for petitioner.

Smythe, Lee & Frost, Joseph R. Lamar, and Henry Crawford, for respondents.

SIMONTON, Circuit Judge.   This case comes up on a petition of the Louisville & Nashville Railroad Company praying payment of certain sums of money alleged to be due to the Georgia Railroad Company by the receiver of the Port Royal & Augusta Railway Company. The main facts upon which this matter depends are these:

On 7th May, 1881, the Georgia Railroad & Banking Company executed to William M. Wadley and his assigns a lease for the term of 99 years of the Georgia Railroad, from Augusta to Atlanta, and its branches, and also the Macon & Augusta Railroad, from Warrenton to Macon, with all its privileges, general and exclusive, of transporting persons, merchandise, produce, and every kind of property which is or may become the subject of railroad transportation over the lines of railroad owned or controlled by the lessor, which railroads were mentioned in the lease.   In consideration of this lease, Wadley covenanted to pay as rent annually the sum of $600,000, in two semiannual payments of $300,000 each, on the 1st days of October and April of each year; also, to pay the interest demandable of the lessor on the bonded debt of the Western Railroad of Alabama (one of the roads controlled by the lessor); also, to return the leased property at the end of the lease in as good condition as it was at the date of the lease, and unimpaired in value; all property substituted for and added to the property leased to be the property of the lessor, to the same extent as the original property for which it was substituted and to which it may be added; also, to keep the railroads and their appurtenances and means of transportation in first-class order, and to indemnify the lessor against all damages, losses, and liabilities incurred in the operation of the roads.   The performance of the covenants by the lessee was to be secured by the deposit of bonds of $1,000,000 in value, of the United States, or other bonds of equal value, always to be kept up to the clear market value of $1,000,000.   On 17th May, 1881, William M. Wadley executed to the Louisville & Nashville Railroad Company an agreement in the words following, in its operative

part,—Wadley being the party of the first part, and the railroad company party of the second part:

"It is mutually covenanted and agreed that * * * for and in consideration of the sum of $12,500 paid by the party of the second part to the party of the first part, and the deposit of $500,000 of bonds, being one-half of the amount stipulated to be deposited, as security for the faithful performance of said lease, with the Farmers' Loan and Trust Company of the city of New York, the said party of the second part shall be entitled to an equal joint control and management of the said Georgia Railroad and its dependencies, together with one-half interest in all advantages and profits resulting from the same: it being understood and agreed that the said Georgia Railroad and its dependencies shall be managed by a board of six commissioners, to be appointed annually,—three to be chosen by the said party of the second part, and the other three by such other party as may control the other one-half interest in this said lease; said six commissioners to elect a seventh, who shall be president of the board, and chief executive officer, for the management of the property under the control of the board. Should the six commissioners as chosen be unable or fail to agree upon the seventh as president of the board, then and in that event an impartial umpire shall be selected to decide, and his decision shall be final."

This agreement was coterminous with the lease.

On 1st June, 1881, an agreement in precisely similar terms was executed between Wadley and the Central Railroad & Banking Company of Georgia, whereby the interest in the other half of said lease was assigned to the latter. These two assignees of this lease, in accordance with the terms of their assignments, respectively, each elected three commissioners, who in turn selected a president, as chief executive officer, and the railroad was managed by this board under the name and style of the Georgia Railroad Company. The course of business was this: Each month a statement was made up, showing the business done for the past month. The net results of the business during this period (reservation being made for contingencies) were divided between and paid over to the Louisville & Nashville Railroad Company and the Central Railroad & Banking Company, equally. Whenever the periods for the payment of the rental approached, the Georgia Railroad Company made requisition upon each of these railroad companies for its share of the semiannual rental, and received a check from each therefor, upon receipt of which the rent was paid. On the 4th of July, 1892, the Central Railroad & Banking Company was placed in the hands of a receiver. He continued to manage the interests of his company in this lease. Having obtained authority from the court to do so, the receiver pledged, with other property of the Central Railroad & Banking Company, its interest in this lease, to secure a loan of money. On 18th September, 1895, the collaterals were sold at public auction, and Messrs. Samuel Thomas and Thomas F. Ryan became purchasers of this interest in this lease. For some time the rights of these gentlemen under this sale were disputed. H. M. Comer, receiver of the Central Railroad & Banking Company, claimed still to hold it, and some claim was set up in behalf of the Central Railroad & Banking Company itself. On their purchase, Messrs. Thomas and Ryan wrote to the president of the Georgia Railroad, offering to pay their share of the installment of rent about to become due first after their purchase. This offer was declined, and

the share of the rent was paid at that time out of the earnings of the road. Subsequently H. M. Comer, receiver, tendered payment of an installment of the rent. This also was declined. The Georgia Railroad Company, in this dispute as to the ownership of a part of the lease, found itself unable to decide between conflicting claimants, and therefore treated the Louisville & Nashville Railroad Company as the only certain party in interest, and received from it moneys which, with the aid of its own resources, met the installments of rent. This controversy has, however been finally settled, at least so far as the present parties are concerned, and Messrs. Thomas and Ryan must be held to be the true owners of this part of the lease. They have assigned and released all their interest in said lease to the Louisville & Nashville Railroad Company, the question made in these proceedings being reserved. It may be assumed, therefore, that on 18th September, 1895, and thenceforward, Thomas and Ryan were co-owners, in this lease of the Georgia Railroad, with the Louisville & Nashville Railroad Company. The Georgia Railroad is the connecting link between the Port Royal & Augusta Railroad and Atlanta, and over it large quantities of freight passed to Port Royal. This Port Royal & Augusta Railroad was in the hands of J. H. Averill, receiver, appointed by this court. This receiver was under contract with the Georgia Railroad Company for the use of terminal facilities at Augusta, and for repairs upon his rolling stock at its workshops in the same city. When the sale of the Port Royal & Augusta Railroad took place under the order of this court, the receiver, J. H. Averill, was largely indebted to the Georgia Railroad Company for traffic balances, for arrears for the use of terminal facilities, and for work done in the repairing shops. The total amount claimed on their several accounts is $90,229.09, upon which interest is also claimed, making a total of $101,197.40. This sale of the Port Royal & Augusta Railroad took place on 1st day of September, 1896, and Messrs. Thomas and Ryan became the purchasers. By the terms of the order of sale the purchaser was required to assume and pay all lawful claims and demands against the receiver. So, on becoming purchasers, Messrs. Thomas and Ryan assumed and were bound to pay the lawful claim of the Georgia Railroad Company. To enforce this obligation these proceedings have been instituted. Inasmuch as the Georgia Railroad is not a corporation,—indeed, is but a designation of the common agent of the assignees of the lease,—the proceedings have been brought in the name of one of the co-owners of the lease, praying the payment of this debt to the Georgia Railroad Company, in order that the shares of the several parties therein may be adjusted, and the amount distributed. Messrs. Thomas and Ryan, admitting the obligation to pay the just claims against the receiver, have paid the sum of $50,000 to the Georgia Railroad Company. As to the remainder they aver that, as part owners of the lease, they are entitled to one-half of the net profits, and that to this extent they can set off their share against the rest of the claim. For further defense they allege that, as to so much of the claim as is made for terminal facilities and repairs of rolling stock, the contracts

of the receiver relating thereto were not authorized by the court, were extravagant and extraordinary, and created no obligation which the purchasers should pay, and that these claims should be reduced to a quantum meruit. Besides this, there are objections to the interest charged in the account, and to the mode of calculation thereof.

With regard to the first line of defense: The mode of administration provided for in the assignments of the lease was the conduct and management of the joint interest in the leased railroad property by the common agent, the Georgia Railroad Company. The entire business was in the hands of this agent, and it received, accounted for, and disbursed all the money from the business. It made up the accounts monthly, and ascertained and distributed the net profits. Each joint owner received its share of these profits,—held it without any charge of interest. When the time came for the payment of the rent, it furnished its check for one-half thereof. So, in the normal course of business, would have been the method with regard to this claim. It would have been presented by the Georgia Railroad Company, would have been received by it, would have gone into the general account, and with other collections would have been used to ascertain the net result, which would have been distributed between the joint owners at the end of the month following its receipt. But, owing to conflicting claims, the ownership of Messrs. Thomas and Ryan and their interest in the lease was not acknowledged. Until this question was finally settled, the common agent looked only to the Louisville & Nashville Railroad Company; and its instructions were obeyed, and this adjustment was postponed. Under these circumstances, it is proper now to look into the accounts existing at the date of the assumption of the debt by Thomas and Ryan, in order to ascertain if this account against the receiver of the Port Royal & Augusta Railway could be treated as a part of the net profits, or was needed to go into the general account, and after proper deductions to be divided between the joint owners. If the claim be a part of the net profits, then, inasmuch as Thomas and Ryan were entitled to the one-half of it at once, it would be a needless ceremony for them to pay the whole of it, and immediately thereafter to have the one-half returned to them. This is an important matter, and may well be stated again. Messrs. Thomas and Ryan admit their liability to pay the debt lawfully contracted by the receiver of the Port Royal & Augusta Railway Company, and assumed by them as purchasers under the terms of the order of sale. They insist, however, that, being part owners of the lease, and of the interests managed by the Georgia Railroad Company, the creditor, they fulfilled this obligation by paying one-half the debt, retaining the other half for themselves, as their share thereof. This position can be maintained only upon the assumption that this account against the receiver of the Port Royal & Augusta Railway is unquestionably a part of the net profits of the common agent of the owners of the lease, and that the uniform course of dealing in the joint ownership required the common agent at once to divide the net profits, and pay over to each part owner

the one-half thereof.   Otherwise, if a debtor, part owner, could retain one-half of his debt, and appropriate it to his own use, and discharge himself by paying the other half to the common agent, to be administered in the joint concern for the common benefit, great injustice would be done to the other co-owner.   It must be noticed, however, that if Messrs. Thomas and Ryan can appropriate to their own use this one-half of the claim against the receiver, because they are part owners of the lease, and this claim is wholly among the net profits, then the other half of the claim belongs to, and should only be paid to, the Louisville & Nashville Railroad Company, the other part owner.   Payment to the Georgia Railroad Company will not do.   The purchase of the Port Royal & Augusta Railway, and the consequent assumption of the debt by Messrs. Thomas and Ryan, was September 1, 1896.   The debt was due then.   The evidence discloses the fact that at that date all the rent due had then been paid.   Of this, one-half was paid by the Louisville & Nashville Railroad Company, by its check for $150,000, being $5,000 in excess of the aggregate of the monthly installments received by it.   The other half was paid out of the moneys in the hands of the Georgia Railroad Company, and by an overdraft of its bank account of $8,352.84.   This overdraft was paid out of subsequent collections of outstanding accounts, the common property of the owners of the lease.   At this date there were of uncollected earnings $121,228.27, in which is included this claim against the receiver of the Port Royal & Augusta Railway.   Between April 1, 1896, and October 1, 1896, the next rental period, no division of the monthly net earnings was made.   None, indeed, was made at any time after that date (April 1, 1896).   All receipts from earnings were accumulated in the treasury, and on 1st October, 1896, the rent was paid from this accumulation, with the sum of $65,000 contributed by the Louisville & Nashville Railroad Company.   The rent payable 1st April, 1897, was paid from the earnings and credit of the Georgia Railroad; neither the Louisville & Nashville nor any other owner contributing anything.   It appears, therefore, that at the date of the assumption of the debt by Ryan and Thomas (September 1, 1896), and of the period of rent payment immediately thereafter, and of the rent period succeeding that (April 1, 1897), there was no distribution of net earnings, monthly or otherwise, and that the common agent was compelled to call for assistance or borrow money in order to supplement the net earnings, and so pay the fixed charge of the rental; and it also appears that the division and distribution of the net earnings ceased then altogether. So the right to retain the one-half of the debt cannot be maintained by Messrs. Thomas and Ryan on this ground.   On the contrary, the collection and receipt by the common agent of all collectible open accounts seemed to be imperatively necessary in order to meet the pressing demands of the rental, and to reimburse the Louisville & Nashville Railroad Company for its advances.   But it is said that this deficiency was caused by payments made by the common agent without proper authority,—such as payments on account of the Augusta Belt Railway, $31,490.82;   loss on the Gainesville, Jef--

ferson & Southern Railroad, $10,783.03; loss on the Union Point & White Plains Railroad, $3,079.52. The obligations for these last-named two railroads were incurred by the lessees jointly at the time that the Central Railroad & Banking Company was in full operation. For the discharge of these obligations they were mutually bound to each other, the liabilities having been incurred for the supposed advantage of the common enterprise, for the promotion of the common interest, and the improvement of the common property. Whatever name be given to the relation between these assignees of the lease to Wadley,—whether they be called "co-tenants," "co-owners," "co partners," or "joint tenants,"—they embarked in a joint enterprise for the purpose of gain; they conducted the enterprise under an agent selected by themselves; they shared in the net profits, and recognized their equal liabilities for the losses of the enterprise; they added to it these two railroads. Each was entitled to the liquidation of the joint liabilities out of the profits of the enterprise, as far as they would go, and they surely could demand this application before net profits could be ascertained or divided. When Messrs. Thomas and Ryan purchased the interest of the Central Railroad & Banking Company, they stepped into the shoes of that company, sharing its obligations as well as its interests, and are bound by all the questions binding it.

The Augusta Belt Railway presents a very serious question. The terms under which the assignment of this lease was held provided for the annual selection of commissioners and of the president. When the sale of the interest of the Central Railroad & Banking Company in the lease was made, and the ownership of this interest was in dispute, no selection of commissioners was made, and the board, with the president, held over. During this period a change was made in the terminal connections at Augusta, and the construction of the Augusta Belt Railroad was determined upon. During this interregnum, before the question who was the owner of the interest of the Central Railroad & Banking Company was determined, the acting board of commissioners, with the president, could well hold on, and preserve the property from forfeiture or loss. But clearly they could not undertake any system of permanent improvements or of addition to the property, or make use of the assets in their hands, except in the manner provided for when the board was first appointed. This construction of the Belt Railroad, involving as it does a large expenditure of money, cannot bind Messrs. Thomas and Ryan, who are now recognized as the purchasers and owners of the interest of the Central Railroad & Banking Company in the lease, without their confirmation and consent. But at the period when Messrs. Thomas and Ryan assumed the payment of the debt of the receiver of the Port Royal & Augusta Railway there had been paid by the Georgia Railroad, in the construction of the Augusta Belt Railway, $31,490.82. This was done with the consent of the Louisville & Nashville Railroad Company, and, if this appropriation be not consented to by Messrs. Thomas and Ryan, it should be charged against that company. It, to that extent, made a deficiency of moneys to pay the installment of rent. Towards

this deficiency, as has been seen, the Louisville & Nashville Railroad Company provided $65,000. So it more than met a deficiency caused by its action. As the practice of estimating the net result monthly, and of dividing the cash thus ascertained between the owners of the lease, ceased from that time, and was never resumed, Messrs. Thomas and Ryan cannot claim the right to withhold one-half of this debt upon the ground that all of it is net earnings. It falls into the category of other outstanding accounts to be collected by the Georgia Railroad Company, to be administered and accounted for by it. This is the only question in this case. What should or may be the result of a general accounting by the Georgia Railroad Company to its principals for the management of the property is not now, and cannot now be, determined. It has been contended that the statements of the Georgia Railroad Company show the purchase of a very large amount of rolling stock and equipment, and also a large balance in bank. There is not enough in the evidence to show the requirements of a railroad such as is the Georgia Railroad, and no means of determining whether the rolling stock and equipment are abnormal and excessive in quantity. By the terms of the lease, the rolling stock of the lessor road was to be kept up. This may account for a part of the equipment, and the necessities of the traffic of the road may account for the remainder. It is an important link between the West and the sea, and the traffic over it must be very great, demanding full equipment.

The next line of defense is a denial of the claim. The account set up by the petitioner is as follows:

| | |
|---|---:|
| To traffic balances | $ 37,362 59 |
| Rent of roundhouse and terminals | 19,916 13 |
| Equipment, repairs, and supplies | 27,036 32 |
| Union depot expenses | 2,859 81 |
| General office expenses and sundries | 1,483 00 |
| Car-mileage balances | 1,571 24 |
| Interest, average time to April 1, 1897 | 10,963 31 |
| Total amount claimed as of April 1, 1897 | $101,197 40 |

With regard to the first item, the traffic balances, this was adjusted by the auditors of both parties, and may be assumed as correct, except in certain particulars hereafter discussed.

The second item, rent of roundhouse and terminals, is questioned upon the ground that the charge is excessive and out of all proportion; and, when compared with similar charges made with other railroads, they are shown to be much in excess of them. The rental thus charged was under a contract made with the receiver of the Port Royal & Augusta Railway, which was never submitted to the court for approval. In Cowdrey v. Railroad Co., 1 Woods, 336, Fed. Cas. No. 3,293, Mr. Justice Bradley says:

"It may be laid down as a general proposition that all outlays made by the receiver in good faith, in the ordinary course, with a view to advance and promote the business of the road, and to render it profitable and successful, are fairly within the line of discretion which is necessarily allowed to a receiver intrusted with the management and operation of a railroad in his hands; * * * and to such outlays, in ordinary course, may properly be referred, not only keeping the road, buildings, and rolling stock in proper

repair, but also the providing of such additional accommodations, stock, and instrumentality as the necessities of the business may require, always referring to the court, or to the master appointed in that behalf, for advice and authority in any matter of importance which may involve a considerable outlay of money. And, except in extraordinary cases, the submission by the receiver of his accounts to the master at frequent intervals, whereby the latter may ascertain from time to time the character of the expenditures made, and disallow whatever may not meet his approval, will be regarded as sufficient reference to the court for its ratification of the receiver's proceedings."

The charges made in this item are in the ordinary business administration of the road, supplying a necessity. These were in the line of discretion which is necessarily allowed the receiver. He was not obliged to come to the court, and get special authority for making the contract. But as the court clearly has the right to review the action of the receiver, and disallow what may not meet its approval, should this contract be approved, and the payment of the claim ordered? There is no question as to the good faith of both parties to this contract; no suggestion of fraud, duress, or unlawful influence. The only question is as to the charge itself. Was it fair or reasonable compensation? At first the agreement was to pay for these terminal facilities $2,000 per month. After trying for one year, the receiver had offers to have the same facilities supplied for $1,500 per month, and upon communicating this to the Georgia Railroad Company the month's rental was reduced to $1,500. Subsequently it was still further reduced to $1,200 per month. It appears in the evidence that this first reduction was made because of competition. It appeared, in the discretion of the receiver, at first, to be reasonable, perhaps necessary. There is no reason to believe that it was unconscionable. Under these circumstances, the court would not feel compelled to disallow the contracts made by the receiver, and to reduce the rental to the last and lowest figure,—a reduction which seems to have been made from a change of circumstances, and not because it appeared to have been at the first improper.

So, also, with the next item,—that for repairs and supplies for equipment. The carefully prepared statement of comparison with the expenditures of other railroads for similar work is striking. But, when we reason from comparison, it must be remembered that all circumstances are not alike. It may have been, for instance, that the close relations between the Central Railroad and the Port Royal & Augusta Railway Company may have induced a more liberal contract. For many years the latter road was completely dominated by the former. Even after they were in the hands of different receivers, the Central Railroad had a deeper interest in the Port Royal & Augusta Railway than any other person or corporation, and that interest continued until the sale. With regard to the Atlantic Coast Line, this system, with its excellent track, close and careful management, and economic methods, superintended and controlled by individuals the actual owners of the property, necessarily conducted its business on a cheaper basis than any other system,—especially one managed by a receiver. The charges in the account before the court are high, but they are neither extravagant

nor unconscionable. They were made in good faith, and accepted by the receiver, a man of large experience and of high character. They will not now be disturbed.

Interest charges: The accounts between the receiver and the Augusta Railroad Company were open accounts. There were no fixed periods of rest agreed upon, and payments were actually made from time to time. Never was there anything which could be called an "account stated." In the statement of the claim there are items of interest charged. These items were carried forward, and again interest was charged. Thus in fact there was a compounding of interest. Clearly, the compound interest .cannot be allowed. Nor should any interest be allowed. In South Carolina, interest is never allowed on open accounts, except on positive stipulation, or an agreement to be established by course of dealing. Skirving v. Stobo, 2 Bay, 233; Ordinary of Fairfield v. Bonner, 2 Hill (S. C.) 468; De Bruhl v. Neuffer, 1 Strob. 426; Holmes v. Charleston Co., 14 S. C. 146.

Exchange charged on draft, $75: There is a small item, $75, in the account, exchange on draft on Port Royal. Such a charge is unusual, and none, as far as the testimony discloses, was charged in any other instance. It is objected to, and is disallowed.

Freight on grain: Another item in the account has been objected to,—$1,133.67. The claim arises in this way: Certain grain was shipped by one Miller, consigned to Port Royal, and getting the benefit of competing rates. It was shipped under what is known as "milling in transit." Under this, Miller had the right to stop the grain in Augusta, mill it, and then ship it to its destination. This privilege he exercised, and shipped the bulk of the grain so milled. A part he did not ship. The whole claim against Miller was $1,755.63. He paid $621.96. This item seeks to hold the receiver of the Port Royal & Augusta Railway responsible for what Miller did not pay to any one. At best, it is for damages caused by the illegal and unauthorized act of Miller. I cannot see how the receiver can be made to pay his debt. At all events, it is not properly an item in an account like this.

Compensation for soliciting agent: The Georgia Railroad Company and the receiver of the Port Royal & Augusta Railway Company had employed soliciting agents at Macon and Montgomery,— perhaps other places. They secured business in which both roads shared. The agency having continued one year, the solicitations went on, with no notice on the part of the Georgia Railroad Company that they should cease, and secured business in which the Georgia Railroad Company shared. The item of $877.20 should be allowed to the receiver in discount of the claim.

Augusta & Summerville Railroad: An item charged against the receiver is one of tolls to this road of $885.54. It seems agreed on all sides that this cannot now be charged against the receiver.

It is ordered that the case be recommitted to the special master to state the account as settled in this opinion.